IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TIFFANY DANIELLE COVINGTON,     §
                                §
          Plaintiff,            §
                                §
v.                              §
                                §
CAROLYN W. COLVIN,              §     CIVIL ACTION NO. H-14-3414
ACTING COMMISSIONER OF THE      §
SOCIAL SECURITY                 §
ADMINISTRATION,                 §
                                §
          Defendant.            §

## <u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross-Motion for Summary Judgment (Doc. 13). The court has considered the motions, the responses, the administrative record,[2] and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income under Title II and Title XVI, respectively, of the Social Security Act (the "SSA").

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Doc. 9, Doc. 10.

## A.  Medical History

Plaintiff was born on February 19, 1982, and was twenty-nine years old on the date of the alleged onset of disability.[3] Plaintiff had an electrical engineering degree and had taken classes for one semester towards a specialization certificate.[4] Plaintiff had previous work experience as a cashier, a stocking clerk, technical support representative, field engineer, and process operator.[5]

On October 17, 2011, Plaintiff was admitted to the emergency room at St. Luke's Episcopal Hospital with numbness in both thighs lasting for three days.[6]  John Stroh Jr., M.D., observed that Plaintiff suffered decreased sensation in both thighs but retained full motor control.[7]  Plaintiff was referred to a radiologist who did not observe any fracture, alignment abnormality, or destructive lesion.[8]  Visveshwar Baskaran, M.D., took a magnetic resonance imaging ("MRI") of the lumbar spine which showed mild lower lumbar facet arthropathy from L3-4 to L5-

---

[3]     See Doc. 6, Tr. Of the Admin. Proceedings ("Tr.") 19.

[4]     See Tr. 17.

[5]     See Tr. 195.

[6]     See Tr. 238, 249.

[7]     See Tr. 238.

[8]     See Tr. 239.

S1 along with mild nerve compression.[9]   Plaintiff was prescribed Norco and Medrol and was referred to a neurologist.[10]

On January 13, 2012, Plaintiff went to Ben Taub General Hospital ("Ben Taub") with complaints of numbness and tingling in her arms and legs.[11]   She stated that the tingling in her legs began after an epidural in August 2009.[12]   Plaintiff stated that she had experienced continuous tingling for a week and a half.[13] Plaintiff recounted that she had lost a dress size with no change in diet or exercise.[14]   Michael Gonzalez, M.D., reported that Plaintiff had decreased limb sensation, more severely in her right leg.[15]   Plaintiff denied loss of strength but reported feeling "unbalanced."[16]

On January 27, 2012, Plaintiff had a follow-up exam at Ben Taub.[17]   Larry Mortazavi, M.D., ("Dr. Mortazavi") performed a physical examination of Plaintiff and found decreased sensation in both legs, particularly the left, and a slightly positive

---

[9]      See Tr. 240.

[10]     See Tr. 246.

[11]     See Tr. 261.

[12]     See id.

[13]     See id.

[14]     See id.

[15]     See Tr. 262.

[16]     See id.

[17]     See Tr. 271.

Romberg exam.[18]   Dr. Mortazavi noted that Plaintiff reported dizziness when her eyes were closed but denied anxiety related to walking in darkness.[19]  He noted that Plaintiff had no strength loss in her extremities.[20]   Dr. Mortazavi recommended Electromyography ("EMG") testing, an MRI of the thoracic and cervical spine, and blood serum level tests.[21] He instructed Plaintiff to visit the emergency room if she experienced any new symptoms.[22]

On March 5, 2012, Plaintiff was given an MRI.[23]  Thomas Saadeh, M.D., ("Dr. Saadeh") reviewed Plaintiff's MRI and noted cervical cord lesions consistent with multiple sclerosis ("MS").[24]

On March 23, 2012, Plaintiff returned to Ben Taub, complaining of progressive weight loss.[25]  Corey Goldsmith, M.D., ("Dr. Goldsmith") reported that Plaintiff's limb numbness was

---

[18]    See Tr. 257.

[19]    See Tr. 256.

[20]    See Tr. 259.

[21]    See id.

[22]    See id.

[23]    See Tr. 294.

[24]    See Tr. 294-97.

[25]    See Tr. 284.

unchanged.[26]  Dr. Goldsmith opined that Plaintiff's symptoms were consistent with MS, vasculitis, or metastasis.[27]  Plaintiff was prescribed baclofen, a muscle relaxant.[28]

On April 17, 2012, a brain MRI was ordered by Dr. Goldsmith.[29]  Dr. Goldsmith found that Plaintiff was positive for lesions consistent with MS.[30]  Dr. Goldman discussed MS with Plaintiff and discussed possible treatments.[31]  Plaintiff showed no new symptoms and it was noted that baclofen had improved her muscle spasticity and gait.[32]  Plaintiff was also prescribed interferon beta 1a.[33]

On August 10, 2012, Plaintiff returned to Ben Taub.[34]  Dr. Goldsmith noted that Plaintiff was "doing quite well," that her gait had improved, and that she did not report fatigue.[35]  Dr. Goldsmith observed that there was no loss of strength in

---

[26]    See id.

[27]    See id.

[28]    See Tr. 286.

[29]    See Tr. 279.

[30]    See Tr. 280.

[31]    See Tr. 279.

[32]    See Tr. 279-280.

[33]    See Tr. 279.

[34]    See Tr. 315-21.

[35]    See Tr. 318.

Plaintiff's extremities, and Plaintiff reported that the tingling sensation had improved.[36]   Dr. Goldsmith renewed Plaintiff's prescription for Avonex.[37]

On September 21, 2012, Plaintiff visited UT Physicians to establish a treatment plan for MS.[38]  She was examined by Carman Whiting, M.D., ("Dr. Whiting") who noted that Plaintiff still suffered from limb numbness and tingling, but reported that she felt much better, which she attributed to her medications.[39]  Dr. Whiting stated that Plaintiff indicated she was exercising regularly.[40]   Dr. Whiting noted that Plaintiff was "more functional" but still experienced pain at times.[41]  Dr. Whiting observed that Plaintiff had a slightly abnormal gait, but that Plaintiff displayed no other symptoms.[42]

On October 31, 2012, Plaintiff returned to UT Physicians where she was seen by John Lindsey, M.D., ("Dr. Lindsey") for a

---

[36]    See id.

[37]    See id.

[38]    See Tr. 358.

[39]    See Tr. 359.

[40]    See Tr. 358.

[41]    See id.

[42]    See id.

follow-up exam.[43]   Plaintiff complained of numbness from the waist down and in her hands, mild urinary urgency, and headaches that occurred twice a week that responded to ibuprofen.[44] Plaintiff also complained of recent weight gain.[45]   Plaintiff's interferon prescription was renewed.[46]

On November 14, 2012, Plaintiff visited UT Physicians emergency room following a minor car crash caused by a temporary loss of consciousness while driving.[47]   Dr. Lindsey opined that the episode was caused by syncope related to medication rather than seizure.[48]

On January 10, 2013 in a follow-up visit with Dr. Lindsey, Plaintiff complained of urinary urgency and was prescribed oxybutynin.[49]

On January 24, 2013, Plaintiff was given an electroencephalogram ("EEG").[50]   The EEG revealed no epileptic

---

[43]   See Tr. 343.

[44]   See id.

[45]   See id.

[46]   See id.

[47]   See Tr. 333.

[48]   See Tr. 336.

[49]   See Tr. 336.

[50]   See Tr. 325.

activity, but did reveal disturbances in the left central and left temporal regions consistent with MS.[51]

On January 25, 2013, Plaintiff returned to Dr. Lindsey and complained of leg pain which affected both the feet and knees.[52] On February 21, 2013, Plaintiff reported to Dr. Lindsey that she was unable to run because of poor balance and complained of headaches that lasted all day and were present most days.[53]

On March 3, 2013, Plaintiff saw Carman Whiting, M.D., ("Dr. Whiting") regarding disability paperwork.[54] Dr. Whiting completed the paperwork on March 11, 2013.[55] Dr. Whiting reported Plaintiff's symptoms as pain in hands, feet, and back, along with tingling in the legs and feet.[56] Dr. Whiting stated that Plaintiff was in "constant" pain and that it was diffused among the hands, legs, and feet.[57] Dr. Whiting listed walking as a precipitating factor and stated that Plaintiff's fatigue was a

---

[51]    See Tr. 325-326.

[52]    See id.

[53]    See id.

[54]    See Tr. 328.

[55]    See Tr. 374.

[56]    See Tr. 368.

[57]    See id.

ten on a ten-point scale and her pain was a nine on a ten-point scale.[58]

Dr. Whiting opined that Plaintiff was able to sit for one hour and stand and walk for one hour in an eight-hour workday.[59] Dr. Whiting stated Plaintiff could occasionally lift and carry between zero and five pounds.[60] Dr. Whiting indicated that Plaintiff would have significant limitations reaching, handling, fingering, or lifting, but did not provide a supporting explanation.[61] Dr. Whiting opined that Plaintiff would have to take repeated fifteen-to-thirty minute breaks in a work-like setting and would need to miss work more than three times per month.[62] Dr. Whiting reported that these symptoms applied as of September 21, 2012,[63] the date of Plaintiff's initial appointment with Dr. Whiting.[64] Dr. Whiting noted that she did not have any laboratory or diagnostic test results that demonstrated or supported her diagnosis.[65]

---

[58]    See Tr. 369.

[59]    See id.

[60]    See id.

[61]    See Tr. 370.

[62]    See Tr. 372-73.

[63]    Dr. Whiting's notes erroneously list the date as September 21, 2013.

[64]    See Tr. 373.

[65]    See Tr. 368.

On March 8, 2013, Dr. Lindsey completed a MS impairment questionnaire on Plaintiff's behalf.[66]   Dr. Lindsey evaluated Plaintiff's prognosis as guarded and noted that Plaintiff suffered from fatigue, numbness, balance problems, bladder problems, sensitivity to heat, and impairment of manual dexterity.[67]   Dr. Lindsey rated fatigue, numbness, and impaired balance as Plaintiff's primary symptoms.[68] According to Dr. Lindsey, Plaintiff's symptoms and functional limitations were reasonably consistent with her physical impairments described in the evaluation.[69]   Dr. Lindsey opined that Plaintiff's symptoms were severe enough to interfere with attention and concentration, that Plaintiff could work in a low-stress environment, needed to be absent from work due to her symptoms less than once a month, and needed to avoid temperature extremes, heights, pushing, bending, and stooping.[70]   Dr. Lindsey further opined that Plaintiff was capable of sitting for six hours a day and standing up to one hour in an eight-hour workday, but that Plaintiff was

---

[66]    See Tr. 360-66.

[67]    See Tr. 360.

[68]    See Tr. 361.

[69]    See Tr. 362.

[70]    See Tr. 361-65.

able to sit continuously in a work setting.[71]  Dr. Lindsey opined that Plaintiff could occasionally lift and carry between five-and-ten pounds.[72]

## B.  <u>Application to Social Security Administration</u>

Plaintiff protectively applied for disability insurance benefits and supplemental security income benefits on February 1, 2012.[73]  Plaintiff claimed she was disabled due to "body numbness" with an onset date of October 17, 2011.[74]  Plaintiff stated that she was taking medications for pain and numbness.[75]

On April 29, 2012, Plaintiff completed a function report outlining her daily activities.[76]  Plaintiff reported that her condition caused hand numbness and affected her balance and ability to walk.[77]  She described her daily routine as waking up with her daughter, getting ready for the day, eating breakfast, and getting dressed.[78]  She was able to prepare lunch for her

---

[71]  <u>See</u> Tr. 364.

[72]  <u>See</u> Tr. 365.

[73]  <u>See</u> Tr. 139, 146.

[74]  <u>See</u> Tr. 159, 163.

[75]  <u>See</u> Tr. 165.

[76]  <u>See</u> Tr. 187-94.

[77]  <u>See</u> Tr. 187.

[78]  <u>See</u> Tr. 188.

daughter and take a nap, then interacted with her daughter until it was time to prepare dinner.[79]   Plaintiff stated that she took care of herself and her two-year-old daughter.[80]   Plaintiff explained that she had problems walking and driving.[81]   She was able to do laundry once a week, clean twice a week, and vacuum thirty minutes per day.[82]   Plaintiff reported that she was able to go shopping once a week.[83]   Plaintiff talked to others daily by phone and attended church every week.[84]   Plaintiff reported that lifting, squatting, bending, standing, sitting and kneeling had to be done slowly because sudden movements caused leg pain.[85] Plaintiff reported that she had no problems paying attention, getting along with authority figures, or following instructions.[86]

On April 30, 2012, Plaintiff filed a work history report that listed her previous jobs as an associate service consultant,

---

[79]     See id.

[80]     See id.

[81]     See id.

[82]     See id.

[83]     See Tr. 190.

[84]     See Tr. 191.

[85]     See Tr. 192.

[86]     See Tr. 193.

technical support associate, cashier, stock-room associate, and assembly-line worker.[87]   As an associate service consultant, Plaintiff worked full time performing site surveys and had to lift and walk with a bag of tools at construction sites.[88]   As a technical support associate, Plaintiff sat eight hours in an office environment documenting customer phone calls.[89]   In her position as a stock room associate, Plaintiff unloaded and transported delivery boxes to the sales floor.[90]   As a cashier, Plaintiff had to stand four-to-eight hours per day and walk four-to-eight hours per day, never lifting more than ten pounds.[91] Plaintiff also worked at Texas Instruments as an assembly-line worker, loading and unloading small parts.[92]   Plaintiff walked and stood twelve hours per day and never lifted more than ten pounds.[93]

---

[87]    See Tr. 195.

[88]    See Tr. 196.

[89]    See Tr. 197.

[90]    See id.

[91]    See Tr. 200.

[92]    See Tr. 199.

[93]    See id.

On May 30, 2012, Scott Spoor, M.D., ("Dr. Spoor") evaluated Plaintiff's physical residual functional capacity ("RFC").[94]  Dr. Spoor found that Plaintiff was able to occasionally lift twenty pounds, frequently lift ten pounds, stand for at least two hours per day, and sit for six hours per day.[95]  He found that Plaintiff could only occasionally crawl, crouch, kneel, or climb, but that she had no visual, communicative, environmental, or manipulative limitations.[96]  Dr. Spoor concluded that the plaintiff's allegations were partially supported by evidence of record.[97]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[98]  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") of the SSA.[99]  The ALJ granted Plaintiff's request and conducted a hearing on August 26, 2013.[100]

**C.  Hearing**

---

[94]     See Tr. 307-14.

[95]     See Tr. 308.

[96]     See Tr. 309-11.

[97]     See Tr. 314.

[98]     See Tr. 73-80, 85-90.

[99]     See Tr. 91.

[100]     See Tr. 25-66.

14

Plaintiff and a vocational expert ("VE") testified at the hearing.[101]  Additionally present on Plaintiff's behalf was a non-attorney representative.[102]

Plaintiff first testified about her work history.[103] Plaintiff worked as a stocker and cashier in 1999.[104]  Following that job, Plaintiff worked as a process operator, working twelve-hour shifts which required her to stand, loading and unloading a machine that built micro-processing wafers in a clean room.[105] Plaintiff testified that she worked for Ross in the stock room and as a cashier.[106]  Following her work with Ross, Plaintiff testified that she worked in tech support for almost a year.[107] Plaintiff last worked as a service consultant, surveying and measuring outdoor fields for almost two years, last working in 2008.[108]

---

[101]    See Tr. 25.

[102]    See Tr. 27.

[103]    See Tr. 30-34.

[104]    See Tr. 34.

[105]    See Tr. 33.

[106]    See Tr. 31.

[107]    See Tr. 31-32.

[108]    See Tr. 32.

The VE testified regarding Plaintiff's work history.[109] The VE stated that Plaintiff's work as a customer service representative was sedentary and skilled, her work as a cashier and process operator was light and unskilled, and her work as a service consultant was light and skilled.[110]

Following the VE's testimony, Plaintiff testified that she was thirty-one years old and had an electrical engineering degree from Prairie View A&M University.[111] Plaintiff stated that she did not smoke or use recreational drugs, although she occasionally drank alcohol.[112] Plaintiff testified that she received Medicaid and lived with her grandmother and four-year-old daughter.[113] Plaintiff stated that she had a driver's license and a vehicle.[114]

Plaintiff testified that she was off work for a period of time after the birth of her child and then did not return to work after her child was diagnosed with cancer.[115] Plaintiff stated

---

[109]    See Tr. 34.

[110]    See Tr. 35.

[111]    See id.

[112]    See Tr. 36.

[113]    See id.

[114]    See id.

[115]    See Tr. 37-38.

that she was unable to work following her daughter's recovery due to Plaintiff's MS diagnosis and body numbness.[116]   Plaintiff testified that she felt her thinking had slowed and that routine actions took more time.[117] Plaintiff stated that she took Avonex to treat her MS, as well as gabapentin, oxybutynin, nortriptyline, and ibuprofen.[118]

Plaintiff testified that she spent her day caring for her daughter, that she did minimal housework and cooking, and allowed her grandmother or her mother to do the majority of the cooking and cleaning.[119]  Plaintiff testified that she last lived alone in 2008.[120]

Plaintiff stated that she did not receive child support, and that she had not made efforts to obtain it through the courts.[121]  The child's father worked and occasionally visited.[122]

---

[116]   See Tr. 38.

[117]   See id.

[118]   See Tr. 38-39.

[119]   See Tr. 39-40.

[120]   See Tr. 40.

[121]   See id.

[122]   See Tr. 40-41.

Plaintiff said that she used her computer, read books and magazines, and watched TV.[123]   Plaintiff testified that while looking for a job she took online classes, but that she quit after one semester.[124]

Plaintiff testified that she first experienced numbness following an epidural in 2009.[125]   She stated that her neurologist told her that the epidural could have been a trigger for MS.[126] Plaintiff stated that she became disabled in October 2011 after her numbness escalated.[127]   Plaintiff explained that the right side of her body felt heavier than the left and her legs felt like weights, although the medicine she was taking helped her maintain balance.[128]   Plaintiff also said that she had issues with weight fluctuation as she had unexpectedly lost forty pounds which she eventually regained.[129]   Plaintiff testified that she had constant numbness in her hands as well as stiffness and

---

[123]   See Tr. 41.

[124]   See Tr. 41-42.

[125]   See Tr. 43.

[126]   See Tr. 44.

[127]   See id.

[128]   See Tr. 45.

[129]   See Tr. 46.

tremors.[130] Plaintiff estimated that she could not lift more than five pounds and that she could not lift her daughter.[131]

Plaintiff stated that her daughter received disability benefits.[132] Plaintiff testified that her mother helped take care of Plaintiff, the house, and Plaintiff's daughter, did the cooking and cleaning, and took care of Plaintiff's grandmother.[133] Plaintiff explained that her mother was paid to watch Plaintiff's child and grandmother.[134]

Plaintiff testified that she could type on a computer for about ten minutes before she had to take a break due to numbness.[135] Plaintiff stated that was able to drive but had not driven since an accident in January when she blacked out.[136] According to Plaintiff, she was told that the blackout was caused by not drinking enough water with medication.[137]   P l a i n t i f f

---

[130]   See Tr. 47.

[131]   See Tr. 48.

[132]   See id.

[133]   See Tr. 49.

[134]   See id.

[135]   See Tr. 50.

[136]   See Tr. 50-51.

[137]   See Tr. 51.

testified that she took nortriptyline every day for headaches.[138] According to Plaintiff, her headaches were near-constant.[139] Plaintiff said that during an eight-hour period, she would spend four-to-five hours lying down.[140] Plaintiff testified that before her hospitalization, she took care of herself and did the cooking and cleaning.[141]  After her hospitalization, she attempted to continue the same tasks but had to take breaks due to leg pain.[142] Plaintiff stated that she would have to take six breaks while cleaning the living room.[143]

Plaintiff further stated that she could sit for fifteen to twenty minutes before she needed to get up.[144]  She stated that walking decreased the pain that she would normally experience from standing.[145] Plaintiff stated that she wanted to have another

---

[138]     See id.

[139]     See Tr. 51-52.

[140]     See id.

[141]     See Tr. 53.

[142]     See id.

[143]     See Tr. 53-54.

[144]     See Tr. 54.

[145]     See Tr. 54-55.

child in the future because she had been told that having a child sometimes improved MS symptoms.[146]

The ALJ asked the VE whether a hypothetical individual of the same age, education, and work history, limited to sitting six hours, standing and walking six hours, lifting twenty pounds occasionally could perform past work.[147]   The VE testified that with these limitations, an individual would be unable to perform any of Plaintiff's past work.[148]   However, the VE found an individual with these limitations could work as a ticket seller, assembler, and packager.[149]   These jobs were light exertion, unskilled jobs that existed in both the regional and national economies.[150]

The ALJ asked whether a hypothetical individual would be able to find work if she was limited to only three hours standing per day.[151]   The VE responded that such an individual could still perform the above-listed jobs.[152]

---

[146]   See Tr. 56.

[147]   See Tr. 57.

[148]   See id.

[149]   See id.

[150]   See id.

[151]   See Tr. 58.

[152]   See id.

Plaintiff's representative asked if the same jobs could be performed by a hypothetical individual if the individual was limited to only lifting and carrying ten pounds occasionally, and the VE responded that she could.[153]   However, when the hypothetical was amended to include sitting for six hours, standing and walking two hours, and lifting ten pounds occasionally, the job became classified as sedentary.[154]   Based on that scenario, the individual could perform unskilled jobs of order clerk, assembler, and surveillance monitor were available in the regional and national economies.[155]

Plaintiff's representative asked if a hypothetical individual would be able to find employment if the standing and walking time was reduced from two hours to one hour, and the VE testified that there would not be any full-time jobs at that exertional level.[156]   The VE testified that sedentary work with occasional use of hands would not change the jobs available.[157]

D.   **Commissioner's Decision**

---

[153]    See Tr. 59.

[154]    See Tr. 59-60.

[155]    See Tr. 62.

[156]    See Tr. 62-63.

[157]    See Tr. 65.

On September 9, 2013, the ALJ issued an unfavorable decision.[158] The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2011.[159] The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 17, 2011.[160] The ALJ found that MS was a severe impairment.[161]

Next, the ALJ determined that Plaintiff's impairment was not of a severity sufficient to meet or equal the listings of the regulations ("The Listings")[162] at any point of the alleged disability period.[163] Regarding Plaintiff's impairment, the ALJ specifically considered Listing 11.09.[164]

The ALJ then conducted an assessment of Plaintiff's RFC based on the objective medical record and Plaintiff's testimony and conduct at the hearing.[165] He determined that Plaintiff retained the RFC to perform less than a full range of light work

---

[158]   See Tr. 20.

[159]   See Tr. 11, 13.

[160]   See Tr. 13.

[161]   See id.

[162]   The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

[163]   See id.

[164]   See id.

[165]   See Tr. 14.

with additional limitations including only occasionally lifting or carrying up to ten pounds, standing or walking about six hours in an eight-hour workday, alternating between sitting and standing, sitting for six hours in an eight-hour workday, and only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs.[166]   The ALJ found that the claimant could not perform production-rate-paced jobs due to medication side effects.[167]

The ALJ determined that while Plaintiff's medically determinable impairment could reasonably be expected to produce Plaintiff's symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.[168]

The ALJ afforded little weight to the opinions of Dr. Lindsey and Dr. Whiting.[169]   The ALJ noted that those opinions were not supported by the relevant treatment records and appeared to be based primarily on subjective reports provided by Plaintiff.[170]   Furthermore, the ALJ found that Dr. Whiting's

---

[166]   See id.

[167]   See id.

[168]   See id.

[169]   See Tr. 18.

[170]   See id.

opinion was inconsistent with treatment records and objective observations from a few days before.[171]

The ALJ next considered whether Plaintiff was able to perform any past relevant work.[172] The ALJ determined that Plaintiff could not perform any of her past relevant work, but that there were jobs available that she could perform.[173] The ALJ therefore found that Plaintiff was not disabled from October 17, 2011, through the date of the ALJ's decision.[174]

Plaintiff appealed the ALJ's decision.[175] While the appeal was pending, the Appeals Council received a letter from Dr. Whiting qualifying her earlier opinion.[176] Dr. Whiting stated that she had only seen Plaintiff on two occasions, six months apart, that the questionnaire answers were subjective in nature, and that she had never received Plaintiff's medical records.[177] Moreover, she stated that further questions regarding Plaintiff's

---

[171]    See id.

[172]    See Tr. 19.

[173]    See Tr. 19-20.

[174]    See Tr. 20.

[175]    See Tr. 7.

[176]    See Tr. 5.

[177]    See Tr. 375.

limitations would be better answered by Plaintiff's treating physician.[178]

On October 1, 2014, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[179]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[180]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

### A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by

---

[178]    See id.

[179]    See Tr. 1-5.

[180]    See Doc. 1, Pl.'s Compl.

reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process: (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and

[RFC] must be considered to determine whether [s]he can do other work.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th

Cir. 1999).   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Plaintiff asserts that the ALJ erred by failing to properly weigh to the opinions of Dr. Lindsey and Dr. Whiting and that the ALJ failed to properly evaluate Plaintiff's credibility.   Defendant maintains that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.   Failure to Properly Weigh Medical Opinions

Plaintiff contends that the medical opinions of Dr. Lindsey and Dr. Whiting were entitled to controlling weight.   Plaintiff argues that the ALJ's decision to grant little weight to both doctors' opinions constitutes reversible error.

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(internal quotations omitted); see SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996) (explaining the circumstances when

medical opinions by treating physicians are entitled to controlling weight). However, the ALJ ultimately may give less weight to the medical opinion of any physician when the statements are conclusory, unsupported, or otherwise incredible. Greenspan, 38 F.3d at 237. When deciding to do so, the ALJ must indicate the specific reasons for discounting the treating source's medical opinion. See SSR 96-2p.

Here, the ALJ summarized Plaintiff's treatment history with Dr. Whiting and Dr. Lindsey. The ALJ noted that in her initial meeting with Dr. Whiting, Plaintiff reported that medications improved her condition and only a slightly abnormal gait was observed. In Plaintiff's initial meeting with Dr. Lindsey, Plaintiff reported numbness in both legs and weakness in her hands, although a physical examination showed normal motor strength. Plaintiff reported decreased sensation along her right leg and in her hands. Plaintiff's gait was also considered normal.

In explaining his reasoning for affording little weight to the March 2013 statements of Dr. Whiting and Dr. Lindsey, the ALJ stated that the doctors' opinions were not supported by the relevant treatment notes and appeared to be based primarily on Plaintiff's subjective reports.[181]   Specifically, the ALJ noted

---

[181]   See Tr. 18.

that while treatment records reflected improved gait and that Plaintiff did not report difficulty walking, both doctors' statements indicated that Plaintiff was capable of standing or walking only one hour in an eight-hour workday. Similarly, the ALJ noted that Dr. Whiting's opinion that Plaintiff's pain was a nine on a ten-point-scale was not supported by the medical records or Dr. Whiting's own treatment notes, which observed only a slightly abnormal gait and general improvement due to medication.

Additionally, Dr. Whiting's letter of October 30, 2013 confirmed that Plaintiff's questionnaire answers were largely self-reported and subjective in nature. Dr. Whiting noted that Plaintiff's sole purpose of her March 5, 2013 visit was to complete the questionnaire, and that Plaintiff had not returned to Dr. Whiting's office or scheduled an appointment after the questionnaire was completed. Dr. Whiting reported that Plaintiff's medical records had been requested but were never received. Dr. Whiting noted that she was not the primary care physician regarding Plaintiff's MS.

The ALJ noted the discrepancies found in the doctors' opinions regarding the intensity and nature of Plaintiff's impairments, and found they were not supported by the medical evidence of record. The ALJ accordingly afforded these opinions

31

less than controlling weight.   See Newton, 209 F.3d at 455-56.
The ALJ thus relied on substantial evidence of record and
properly adhered to legal procedures in determining Dr. Lindsey
and Dr. Whiting's opinions were entitled to less than controlling
weight.

**B.   <u>Plaintiff's Credibility</u>**

Plaintiff also argues that the ALJ erred by improperly
evaluating Plaintiff's testimony at the hearing regarding the
severity of her symptoms and their affect on her ability to work.

While an ALJ must consider a claimant's complaints of pain,
he is permitted to examine the medical evidence to find that
claimant's complaints are exaggerated or not credible.   <u>Johnson
v. Heckler</u>, 767 F.2d 180, 182 (5th Cir. 1985).   When an ALJ's
opinion is supported by substantial evidence, the court must
defer to the ALJ's assessment.   <u>Villa v. Sullivan</u>, 895 F.2d 1019,
1024 (5th Cir. 1990).

In this case, the ALJ properly recited Plaintiff's testimony
and weighed it against both the objective medical evidence and
Plaintiff's previous statements contained in her function
report.[182]   Specifically, the ALJ noted that Plaintiff's testimony
regarding pain and overall limitations was not supported by the
objective records.   The ALJ noted that Plaintiff had no records

---

[182]   <u>See</u> Tr. 18-19.

32

supporting her hearing testimony regarding loss of strength or difficulty walking or lifting.[183]

The ALJ assigned less weight to Plaintiff's statements when they were contradicted by the evidence of record. However, the ALJ did not completely discount Plaintiff's testimony regarding her condition and found her more limited than Dr. Spoor's initial assessment based in part on the side-effects of her medication. Because the ALJ determined Plaintiff's testimony was not credible only where it was not consistent with the objective record, the ALJ did not err as a matter of law in assessing Plaintiff's credibility.

For the reasons stated above, the court finds that Defendant satisfied her burden. As a result, the ALJ's decision finding Plaintiff not disabled is supported by substantial record evidence. The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination. Therefore, the court **GRANTS** Defendant's motion for summary judgment.

## IV.  Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion for Summary Judgment be and **GRANTS** Defendant's Motion for Summary Judgment.

---

[183]    See id.

33

**SIGNED** in Houston, Texas, this 24<u>th</u>  day of August, 2015.

_____

U.S. MAGISTRATE JUDGE